UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:15-CV-00891-GNS

GOLDEN GATE NATIONAL SENIOR CARE, LLC;
GGNSC LOUISVILLE HILLCREEK, LLC
d/b/b GOLDEN LIVING CENTER – HILLCREEK;
GGNSC ADMINISTRATIVE SERVICES, LLC;
GGNSC HOLDINGS, LLC;
GGNSC EQUITY HOLDINGS, LLC;
GGNSC EQUITY HOLDINGS II, LLC;
GOLDEN GATE ANCILLARY, LLC;
GGNSC CLINICAL SERVICES, LLC;
GPH LOUISVILLE HILLCREEK, LLC                                    PLAINTIFFS

v.

DEBORAH K. FLESHMAN                                              DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion to Compel Arbitration and Stay State Court Action (DN 5). The motion is ripe for a decision. For the reasons stated below, the motion is **GRANTED**.

### I.    SUMMARY OF FACTS AND CLAIMS

Deborah K. Fleshman ("Fleshman") resided at Golden Living Center – Hillcreek ("Golding Living") in Louisville, Kentucky, from approximately December 2014 until March 2015. (Compl. Ex. 2, ¶ 2, DN 1-2). At the beginning of her residency, Fleshman executed the Alternative Dispute Resolution Agreement ("Agreement"). (Alternative Dispute Resolution

Agreement 7, DN 1-3 [hereinafter ADR Agreement]). The parties have not disputed that claims asserted in the state court action fall within the terms of the Agreement.[1]

On December 1, 2015, Fleshman filed a lawsuit in Jefferson Circuit Court entitled *Fleshman v. Golden Gate National Senior Center, LLC*, Civil Action No. 15-CI-006041. (Compl. Ex. 2). In the state court complaint, Fleshman asserts claims of, *inter alia*, negligence, medical negligence, corporate negligence, and violation of her rights under KRS 216.510 *et seq*. against various defendants, including Plaintiffs of this action.[2] (Compl. Ex. 2, ¶¶ 26-48).

Plaintiffs then filed this action seeking to enforce the arbitration provision in the Agreement pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16. Plaintiffs subsequently moved to enforce the arbitration provision, and Fleshman moved to dismiss the case. (Pls.' Mot. to Compel Arbitration & Stay State Court Action, DN 5; Def.'s Mot. to Dismiss, DN 11). At the parties' request, the Court initially addressed Fleshman's motion, which was denied. (Mem. Op. & Order, DN 23). At the evidentiary hearing held on July 28,

---

[1] The Agreement applies to:

> any and all disputes arising out of or in any way relating to this Agreement or to the Resident's stay at the Facility or the Admissions Agreement between the Parties that would constitute a legally cognizable cause of action in a court of law sitting in the state where Facility is located. Covered Disputes include but are not limited to all claims in law or equity arising from one Party's failure to satisfy a financial obligation to the other Party; a violation of a right claimed to exist under federal, state, or local law or contractual agreement between the Parties; tort; breach of contract; consumer protection; fraud; misrepresentation; negligence; gross negligence; malpractice; and any alleged departure from any applicable federal, state, or local medical, health care, consumer, or safety standards.

(ADR Agreement 3).
[2] Fleshman also asserted claims against various individuals who are not parties to this federal action. (Compl. Ex. 2, ¶¶ 49-54).

2016, and August 8, 2016, the parties presented evidence to address whether Fleshman had the mental capacity to execute the Agreement.[3]

## II. STANDARD OF REVIEW

In ruling on a motion to compel arbitration, courts apply the summary judgment standard in Fed. R. Civ. P. 56(c). *See Arnold v. Rent-a-Center, Inc.*, No. 11-18-JBC, 2011 WL 1810145, at *2 (E.D. Ky. May 12, 2011) ("This court will treat the motion to compel arbitration as one for summary judgment . . . ."); *Weddle Enters., Inc. v. Treviicos-Soletanche, J.V.*, No. 1:14CV-00061-JHM, 2014 WL 5242904, at *2 (W.D. Ky. Oct. 15, 2014) ("A motion to dismiss based on the existence of a valid arbitration agreement is not evaluated under the usual Fed. R. Civ. P. 12(b)(6) standard. Instead, courts apply the standard applicable to motions for summary judgment." (citations omitted)). "In order to show that the validity of the agreement is in issue, the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate, a showing that mirrors the summary judgment standard." *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002) (internal quotation marks omitted).

## III. DISCUSSION

Under the FAA, a written agreement to arbitrate involving a dispute arising out of a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon

---

[3] Due to ongoing medical issues, Fleshman was not present for and was unable to testify at the evidentiary hearing. (Evidentiary Hr'g Tr. 9:9-10, 13:10-15, July 28, 2016, DN 30 [hereinafter Hr'g Tr. vol. 1]). While her counsel represented that she has no independent recollection of executing the Agreement, Fleshman did not allege that the signature was a forgery or that someone else signed the Agreement. (Hr'g Tr. vol. 1, 9:10-11, 10:8-13). Rather, her counsel argued that the signature did not look like Fleshman's and presented testimony from family members on that issue. (Hr'g Tr. vol. 1, 10:8-13, 30:1-31:7, 54:21-55:4, 70:25-71:17, 81:13-15). As result, the Court held that Plaintiffs had met their *prima facie* burden and that burden had shifted to Fleshman to prove her lack of capacity. (Hr'g Tr. vol. 1, 10:14-15).

3

such grounds as exist at law or in equity for the revocation of any contract." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) (quoting 9 U.S.C. § 2).

> When considering a motion to stay proceedings and compel arbitration under the Act, a court has four tasks: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Id.* (citing *Compuserve, Inc. v. Vigny Int'l Fin., Ltd.*, 760 F. Supp. 1273, 1278 (S.D. Ohio 1990)). Generally, any doubts regarding arbitrability are to be resolved in favor of arbitration. *See Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003) (citation omitted). *See also Southland Corp. v. Keating*, 465 U.S. 1, 10-11 (1984) (holding that the FAA preempts state law regarding arbitration).

In this case, Fleshman has opposed the enforcement of the Agreement on the bases that she lacked the capacity to execute the Agreement and that the Agreement's terms are unconscionable. For the reasons outlined below, the Court rejects both arguments.

### A. Capacity to Execute Agreement

Under Kentucky law, the general presumption is that "all persons are presumed to possess mental capacity sufficient to contract until the contrary is shown . . . ." *Rath's Comm. v. Smith*, 202 S.W. 501, 503 (Ky. 1918). As a result, "an executed contract will not be lightly set aside in the absence of clear and convincing evidence." *Lausman v. Brown*, 168 S.W.2d 579, 585 (Ky. 1943); *see also Fitch v. Burns*, 782 S.W.2d 618, 622 (Ky. 1990) (noting that the clear and convincing evidence standard "requires the party with the burden of proof to produce evidence substantially more persuasive than a preponderance of evidence, but not beyond a reasonable doubt."). As the party seeking to invalidate the arbitration provision, Fleshman bears

4

the burden of proof and must present "some direct proof sufficient to convince the minds of the court that at the time the [contract] [was] entered into that [she] did not and could not understand [her] acts." *Revlett v. Revlett*, 118 S.W.2d 150, 155 (Ky. 1938)*; see also Rath's Comm.*, 202 S.W. at 503 ("As a general proposition, all persons are presumed to possess mental capacity sufficient to contract until the contrary is shown, and he burden of showing mental incapacity is upon the person asserting it.").

1. *Summary of Evidence*

During the evidentiary hearing, Fleshman proffered testimony from her mother, two brothers, and an expert witness, Daniel M. Lively, M.D. On the date of Fleshman's transfer to GGNSC—December 11, 2014—her transfer was originally supposed to occur in the afternoon, and she was last seen by a physician around 9 a.m. (Hr'g Tr. vol. 1, 116:22-117:12). Due to transportation issues, the transfer did not occur until approximately 12 hours later. (Hr'g Tr. vol. 1, 17:15-24, 33:13-16; Evidentiary Hr'g Tr. 68:2-4, Aug. 8, 2016, DN 33 [hereinafter Hr'g Tr. vol. 2]).

When Fleshman arrived at Golden Living, the facility did not have a pharmacy in the building to dispense her pain medication, which had to come from Indianapolis after Fleshman's admission. (Hr'g Tr. vol. 1, 19:24-20:5; Hr'g Tr. 74:13-25). As a result, there was a delay in Fleshman receiving her pain medication, and Fleshman's family testified that she was in noticeable pain and acted irrationally because of the delay. For example, Fleshman's mother testified that she recalled seeing Fleshman attempt to eat a blanket and attempt to push an imaginary pain pump button. (Hr'g Tr. vol. 1, 21:18-22:2, 63:3-11). The family also stated that Fleshman was preoccupied with the trapeze attached to her hospital bed. (Hr'g Tr. vol. 1, 20:25-21:13, 63:19-24). According to the family, it was after midnight before Fleshman was

administered pain medication and was no longer restless. (Hr'g Tr. vol. 1, 23:5-9, 24:2-4). Fleshman's mother did not recall Fleshman executing any admission paperwork or the Agreement around the time of her admission to Golden Living. (Hr'g Tr. vol. 1, 23:14-24, 24:11-14).

At the time of Fleshman's admission to Golden Living, Jacqueline Hancock ("Hancock") was the Director of Admissions. (Hancock Aff. ¶ 2, DN 15-6; Hr'g Tr. vol. 2, 5:16-19). In that position, it was Hancock's responsibility to prepare the admission paperwork for new residents. (Hr'g Tr. vol. 2, 6:6-20). Hancock testified that it was her practice to prepare the paperwork in advance of the patient's arrival, and she would typically date the paperwork with the anticipated admission date at the time she completed the paperwork. (Hr'g Tr. vol. 2, 6:8-12, 7:8-10, 20:11-18). When Hancock met with patients, she usually would spend 30 to 60 minutes going over the admission paperwork and allowed patients to read the paperwork before signing it. (Hr'g Tr. vol. 2, 8:12-9:3, 14:7-14, 26:3-14). Medical staff would meet separately with new patients to discuss medical-related paperwork but were not involved in a patient's signing of the Agreement. (Hr'g Tr. vol. 2, 7:19-23).

As to Fleshman's admission, Hancock testified that it was unlikely that she was at the facility at the time of Fleshman's arrival and does not have any specific recollection of meeting with Fleshman to discuss execution of the Agreement. (Hr'g Tr. vol. 2, 5:20-24, 8:9-11, 12:10-15, 26:16-18, 27:4-6). Hancock believed that she presented the Agreement to Fleshman on the morning or early afternoon of December 12, 2014, and Hancock verified that she signed the Agreement as a witness to Fleshman's signature. (Hr'g Tr. vol. 2, 11:20-12:15). Hancock testified that she would not have signed as a witness if Fleshman had not read the Agreement. (Hr'g Tr. vol. 2, 26:15-18).

6

Plaintiffs also called two clinical personnel from Golden Living to testify about Fleshman's medical condition around the time of her admission. Fatina Sordan ("Sordan") is a registered nurse and was employed at Golden Living at the time of Fleshman's admission. (Hr'g Tr. vol. 2, 64:19-22). Sordan handled Fleshman's admission to the facility on December 11, 2014. (Hr'g Tr. vol. 2, 65:1-5). Sordan recalled presenting the medical forms to Fleshman. (Hr'g Tr. vol. 2, 66:9-18). At that time, Fleshman was alert and orientated, and she appeared to understand the forms. (Hr'g Tr. vol. 2, 66:9-18). Sordan also observed Fleshman on the morning of December 12, 2014, and noted that Fleshman was alert and orientated at that time as well. (Hr'g Tr. vol. 2, 69:12-70:2). Sordan did not recall Fleshman speaking incoherently or any unusual behavior like eating bedsheets or pushing imaginary buttons, as reported by Fleshman's family. (Hr'g Tr. vol. 2, 72:22-73:4).

Tiffany Huff ("Huff") was also a registered nurse working at Golden Living during the relevant time period. (Hr'g Tr. vol. 2, 78:16-79:8). At the time of Fleshman's admission, Huff was primarily working day shifts. (Hr'g Tr. vol. 2, 79:19-80:1). Reviewing the progress notes from December 12, 2014, Huff stated that she did not note any mental change of status for Fleshman. (Hr'g Tr. vol. 2, 80:16-81:17). Huff testified that Fleshman possessed the ability to make decisions during her residency at Golden Living. (Hr'g Tr. vol. 2, 81:18-21). Huff did not recall Fleshman speaking incoherently, attempting to eat bed sheets, or pushing imaginary buttons during her stay at Golden Living. (Hr'g Tr. vol. 2, 85:18-86:1).

The parties presented conflicting expert testimony about Fleshman's mental condition in the relevant time period. Neither of the expert witnesses was Fleshman's treating physician, and neither observed Fleshman at the time of her admission to Golden Living.

Fleshman called Dr. Daniel Mark Lively, a board certified internist in geriatric medicine who practices in the areas of internal and geriatric medicine at Contra Costa Regional Medical Center in Martinez, California. (Hr'g Tr. vol. 1, 84:22-25, 85:10-14). Dr. Lively approached Fleshman's competency from a hematological and pharmacological standpoint by reviewing her medical records and the Kentucky All Schedule Prescription Electronic Reporting System ("KASPER") report from February 2014 until Fleshman's transfer from Norton Audubon Hospital to Golden Living in December 2014. (Hr'g Tr. vol. 1, 135:11-24). Based upon his examination of the medical records, Dr. Lively opined that Fleshman suffered from profound anemia as evidenced by her hemoglobin levels measured at 7.9 grams (as compared to the normal range of 13.5 to 17.5 grams) on December 10, 2014, which had not increased to the normal range prior her admission to Golden Living. (Hr'g Tr. vol. 1, 95:10-12, 118:4-21). Dr. Lively testified that the profound anemia would have directly impacted her competency at that time. (Hr'g Tr. vol. 1, 92:9-93:12).

Dr. Lively examined the narcotic medication that Fleshman received in the 24-to-48-hour period preceding her transfer to Golden Living. (Hr'g Tr. vol. 1, 100:7-104:8). Using the morphine standard to evaluate the narcotic equivalence of Fleshman's narcotic medications, Dr. Lively calculated that she had received a morphine equivalent of 540 milligrams, which he characterized as "a massive amount of pain medication . . . ." (Hr'g Tr. vol. 1, 104:11-17, 106:8-19). He stated that Fleshman was not narcotic tolerant. (Hr'g Tr. vol. 1, 107:7-13). Based upon the cumulative effect of her medications and her medical conditions, Dr. Lively opined that Fleshman lacked the mental capacity to execute the Agreement. (Hr'g Tr. vol. 1, 122:21-123:5, 123:12-124:4).

Dr. Timothy Allen was called as a rebuttal witness. Dr. Allen is a psychiatrist and is licensed to practice medicine in the Commonwealth of Kentucky. (Hr'g Tr. vol. 2, 29:1-7). Dr. Allen is certified by the Board of Psychiatry and Neurology in both general and forensic psychiatry. (Hr'g Tr. vol. 2, 29:7-9). Dr. Allen is a faculty member at the University of Kentucky, maintains a private practice, and contracts with the Commonwealth of Kentucky to perform competency evaluations at the Kentucky Correctional Psychiatric Center. (Hr'g Tr. vol. 2, 29:10-30:9). Like Dr. Lively, Dr. Allen reviewed Fleshman's medical records from Norton Audubon Hospital and Golden Living, the affidavits filed in this action, and observed the testimony of witnesses during the evidentiary hearing. (Hr'g Tr. vol. 2, 30:19-31:14).

Dr. Allen discounted Dr. Lively's opinion of opiate tolerance. (Hr'g Tr. vol. 2, 38:17-39:7). Given the time period in which Fleshman had been prescribed narcotics for her pain, Dr. Allen opined that she would have more tolerance than a patient who had not been prescribed opiates. (Hr'g Tr. vol. 2, 38:17-39:7). Dr. Allen noted that there was no clinical evidence to support the conclusion that Fleshman was delirious at the time of admission as a result of her pain medication. (Hr'g Tr. vol. 2, 39:8-10).

Dr. Allen also criticized Dr. Lively's discount of the nursing professionals' observations of Fleshman. Dr. Allen noted that the nurses were not responsible for conducting mental status evaluations of Fleshman. (Hr'g Tr. vol. 2, 39:13-40:3). Dr. Allen also testified that it was his experience that nurses have a bias to find every problem, and the lack of notation of any concerns regarding her mental condition by the nurses reflects that they observed none. (Hr'g Tr. vol. 2, 40:4-21; 57:21-58:8). Ultimately, Dr. Allen opined that there was insufficient evidence for him to believe (or to support Dr. Lively's opinion) that Fleshman was not competent on the day she executed the Agreement. (Hr'g Tr. vol. 2, 60:5-13)

### 2. *Findings of Fact & Conclusions of Law*

The parties presented conflicting testimony about Fleshman's medical condition during the relevant time period. Keeping in mind that Fleshman had the burden to prove her incapacity by the heightened standard of clear and convincing evidence, the Court makes various findings of fact on this issue.

While Fleshman's family questioned her competency during the relevant period, the Court finds that the medical professionals attending Fleshman all reported her alert and orientated. It was undisputed that no one conducted a comprehensive mental health exam of Fleshman at the time of her admission to Golden Living. Even in the absence of such an examination, the Court finds that Norton Audubon Hospital would not have discharged Fleshman if she had been delirious at that time.

The Court finds that Fleshman did have some degree of narcotic tolerance and that Fleshman was taking lower dosages of narcotics at the time of her admission to Golden Living. While Fleshman did not initially have pain medication when she arrived at Golden Living, the Court finds that Fleshman received pain medication prior to her execution of the Agreement on December 12, 2014. The testimony of the nursing professionals supports the finding that Fleshman was competent around the time of her admission to Golden Living.

The Court finds that it is more likely than not that Fleshman executed the Agreement on December 12, 2014, rather than December 11, 2014. Hancock was not at Golden Living at the time Fleshman arrived, and the Court finds that Hancock met with Fleshman to execute the Agreement sometime between mid-morning and early afternoon on December 12, 2014. Based upon Hancock's testimony that she would not have had a patient sign the Agreement if the patient did not appear competent, the Court finds that Fleshman appeared competent when

Fleshman executed the Agreement. The Court also finds that Fleshman read the Agreement before executing the Agreement based on Hancock's testimony that she would not have witnessed Fleshman's signature if Fleshman had not read the Agreement. While disputed by the Fleshman's family, the Court finds that the signature on the Agreement is Fleshman's.

Based upon the findings of fact above, the Court concludes that Fleshman failed to meet her burden to prove by clear and convincing evidence that she was not competent to execute the Agreement. Because there is insufficient evidence to overcome the presumption of capacity, the Court concludes that Fleshman had the necessary capacity to execute the Agreement, and she signed that Agreement in which she agreed to arbitrate her claims against Plaintiffs. Thus, the arbitration provision in the Agreement executed by Fleshman is not invalid for lack of capacity on the part of Fleshman.

### B.    Unconscionability

Fleshman also argues that the Court should refuse to enforce the Agreement on the basis of unconscionability. Under Kentucky law, "[t]he doctrine of unconscionability is recognized as a narrow exception to Kentucky's fundamental rule of enforcing validly executed contracts according to their terms." *Davis v. Glob. Client Sols., LLC*, 765 F. Supp. 2d 937, 940 (W.D. Ky. 2011) (citation omitted). To determine whether this doctrine precludes enforceability of the arbitration provision, the Court must conduct "a two step process—first, a review focused on the procedures surrounding the making of the arbitration clause (procedural unconscionability) and second, a review of the substantive content of the arbitration clause (substantive unconscionability)." *Schnuerle v. Insight Commc'ns Co., L.P.*, 376 S.W.3d 561, 575 (Ky. 2012) (citation omitted).

With regard to procedural unconscionability, this Court has noted:

> Procedural unconscionability, also known as unfair surprise . . . pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language. The Supreme Court of Kentucky recently held that an arbitration clause was not procedurally unconscionable where: the clause was not concealed or disguised within the form; its provisions are clearly stated such that purchasers of ordinary experience and education are likely to be able to understand it, at least in its general import; and its effect is not such as to alter the principal bargain in an extreme or surprising way.

*Davis*, 765 F. Supp. 2d at 941 (internal quotation marks omitted) (internal citation omitted) (citation omitted). As this Court has noted, arbitration provisions in boiler-plate, pre-printed documents are not procedurally unconscionable. *GGNSC Louisville Hillcreek, LLC v. Warner*, No. 3:14-CV-752-H, 2013 WL 6796421, at *9 (W.D. Ky. Dec. 19, 2013). It is also not unconscionable for the arbitration agreement to be included in a lengthy admissions process during which numerous forms are executed. *See GGNSC Louisville Hillcreek, LLC v. Watkins*, No. 3:15-CV-902-DJH, 2016 WL 815295, at *6 (W.D. Ky. Feb. 29, 2016) ("[M]any situations—such as buying a house or a car, visiting the doctor, or starting a new job—involve a lengthy process in which an individual must complete a substantial amount of paperwork. This alone does not make a contract procedurally unconscionable."). Thus, while Fleshman signed the Agreement as part of the admissions process, she has not established that the Agreement is procedurally unconscionable.

Likewise, enforcement of the Agreement is not precluded by substantive unconscionability. As this Court has explained:

> Substantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent. As for substantive unconscionability, courts consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns.

*Davis*, 765 F. Supp. 2d at 941 (internal quotation marks omitted) (internal citation omitted) (citation omitted). A difference in bargaining power alone does not amount to unconscionability. *See Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341 (Ky. App. 2001). From the Agreement itself, the arbitration provision is not substantively unconscionable because: (i) its provisions are plainly stated; (ii) the implications are in capitalized bold type;[4] (iii) the provisions are reciprocal and do not limit recovery by either party; (iv) the Agreement specifically states that consenting to arbitration is not a condition of admission to or continued residency at the facility; and (v) the Agreement granted Fleshman the right to opt-out within thirty days of execution of the Agreement. (Compl. Ex. B, at 1-7, DN 1-3). Under these circumstances, the Court finds that there is no substantive unconscionability and concludes that the Agreement is enforceable.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiffs' Motion to Compel Arbitration and Stay State Court Proceedings (DN 5) is **GRANTED**. Deborah K. Fleshman is hereby **ENJOINED** from proceeding in Jefferson Circuit Court (Civil Action No.

---

[4] The Agreement specifically contained the following notation on the first page in bold letters:

> THE PARTIES UNDERSTAND, ACKNOWLEDGE, AND AGREE THAT THEY ARE SELECTING A METHOD OF RESOLVING DISPUTES WITHOUT RESORTING TO LAWSUITS OR THE COURTS, AND THAT BY ENTERING INTO THIS AGREEMENT, THEY ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE THEIR DISPUTES DECIDED IN A COURT OF LAW BY A JUDGE OR JURY, THE OPPORTUNITY TO PRESENT THEIR CLAIMS AS A CLASS ACTION AND/OR TO APPEAL ANY DECISION OR AWARD OF DAMAGES RESULTING FROM THE ADR PROCESS EXCEPT AS PROVIDED HEREIN.

(Compl. Ex. B, at 1). Immediately above the signature line, the Agreement also states in bold letters that "THIS AGREEMENT GOVERNS IMPORTANT LEGAL RIGHTS. PLEASE READ IT CAREFULLY AND IN ITS ENTIRETY BEFORE SIGNING." (Compl. Ex. B, at 7).

15-CI-006041) against Golden Gate National Senior Care, LLC d/b/a Golden Living; GGNSC Louisville Hillcreek, LLC d/b/a Golden Living Center – Hillcreek; GGNSC Administrative Services, LLC d/b/a Golden Ventures; GGNSC Holdings, LLC d/b/a Golden Horizons; GGNSC Equity Holdings, LLC; GGNSC Equity Holdings II, LLC; Golden Gate Ancillary, LLC d/b/a Golden Innovations; GGNSC Clinical Services, LLC d/b/a Golden Clinical Services; and GPH Louisville Hillcreek, LLC.  The Court will **STAY** this proceeding until the conclusion of the ordered arbitration pursuant to 9 U.S.C. § 3, at which time the Court will determine whether to enter a judgment approving any arbitration award.

**Greg N. Stivers, Judge**
**United States District Court**
September 12, 2016

cc: counsel of record
Jefferson Circuit Court Clerk, Civil Action No. 15-CI-006041